UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF | DOCKET NO. 09-11789 |
| JULIE OSTARLY BURGHARDT | |
| | SECTION A |
| DEBTOR | CHAPTER 13 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| KEITH G. PFISTER | ADVERSARY NO. |
| PFISTER & COMPANY, L.C. | 11-1072A |

      PLAINTIFF

VERSUS

JULIE OSTARLY BURGHARDT
J.E.B. HOLDINGS, L.L.C.
XYZ PARTNERSHIP

      DEFENDANTS

**MEMORANDUM OPINION**

On October 22, 2008, Keith A. Pfister ("Pfister") filed a Petition for Accounting, Dissolution, Liquidation and Partition of Partnership in the Civil District Court for the Parish of Orleans ("State Suit"). The State Suit demanded: 1) An accounting of the books and records of XYZ Partnership; 2) dissolution, liquidation and partition of the partnership after an accounting; 3) sequestration of all property and assets of XYZ Partnership until resolution of the case; and 4) appointment of Pfister as judicial liquidator of XYZ Partnership. The State Suit also demanded that Julie O. Burghardt ("Burghardt" or "Debtor") and J.E.B. Holdings, L.L.C. ("JEB") show cause why judgment against Burghardt should not be entered for amounts demanded.

1

On June 15, 2009, Burghardt filed a Voluntary Petition for Relief under Chapter 13 of Title 11. Pfister filed proof of claim no. 11 ("POC 11") for $500,000.00 for "real estate and money loaned." An Objection to POC 11 was filed on February 24, 2010.[1] On July 8, 2011, Pfister removed the State Suit which was referred to this Court as this adversary proceeding.[2] Burghardt filed an Answer and Counterclaim.[3] Pfister answered the Counterclaim, and trial on the merits of the State Suit and Objection to POC 11 was held on January 3, 2012, after which the Court took the matter under advisement.

**I. FACTS**

Burghardt's Schedules of Assets and Liabilities ("Schedules") reflect full ownership in four (4) properties that are subject to the claims of Pfister. According to amended Schedule D,[4] Chase Home Finance ("Chase") holds mortgages on each one.[5] Specifically, Debtor's Schedules reflect:

| Property | Value | Mortgage |
| --- | --- | --- |
| 4122 Fountainbleu | $285,000.00 | $ 77,274.00 |
| 4301 Marais Street | $110,000.00 | $106,026.00 |
| 2736 Lavender Street | $120,000.00 | $114,583.00 |
| 1501-03 France Street | $ 50,000.00 | $114,896.00 |

Burhardt's plan of reorganization was confirmed on October 19, 2009 but later modified with

---

[1] P-73.

[2] P-125.

[3] P-4.

[4] P-36.

[5] P-11.

court approval on April 11, 2011.[6] The modified plan ("Plan") provided for monthly payments to the chapter 13 trustee ("Trustee") of $347.00 per month for eighteen (18) months then $665.06 for forty-two (42) months.[7] Since the Chase loans against 4301 Marais St., 2736 Lavender St. and 1501-03 France St. were in arrears when Debtor filed for relief, each default was cured through payments to the Trustee. In addition, any installments accruing postpetition on the Chase loans were directly satisfied by Burghardt.

The relationship between Burghardt and Pfister began in 2007. At the time, Pfister was in New Orleans, buying, renovating and selling properties damaged by Hurricane Katrina. He convinced Burghardt that substantial money could be made flipping renovated properties. Since he had expertise in construction and access to building supplies and labor, it was agreed that Burghardt would fund the initial purchase of the properties, he would supply the labor and materials for their renovation: and they would divide the profits on sale. The details of how the costs to renovate or purchase would be recouped by the parties were not defined, but since none of the properties ultimately sold, that issue was deferred until the State Suit was filed.

On April 18, 2007, Burghardt formed JEB to buy, sell, operate and manage immovable property. Burghardt is the sole member and manager of JEB.[8] The formation of JEB was a precursor to Debtor's involvement in the activities proposed by Pfister.

---

[6] P-115.

[7] P-94, 96.

[8] Exh. 41.

On August 1, 2007, Burghardt and Pfister purchased their first house located at 4301 Marais St., New Orleans ("Marais") for $42,785.87.[9] For unknown reasons, title to Marais was placed in the name of JEB although it was clearly Burghardt and Pfister's intention that they co-own the property. The purchase price was supplied by Burghardt through a withdrawal from her IRA account. Pfister began renovations shortly after the Act of Sale. The parties expected the purchase price of Marais to be equivalent to the costs of renovation. As a result, Pfister did not keep records of the costs of supplies or labor invested in the renovations. Renovations to Marais were complete by October 31, 2007. However, it did not sell and tenants were placed in the property on November 1, 2007.

In September 2007, the property located at 4122 Foutainbleu ("Foutainbleu") was purchased. Unlike the prior purchase, Fountainbleu was acquired by using a mortgage loan from Chase for $78,300.00 and a cash down payment from Burghardt of $15,331.87.[10] Debtor was the only signatory on the loan and the property was purchased in her name. Prior to the purchase, Pfister discussed the costs of repairs needed on the property. However, unlike with their other purchases, renovations on Fountainbleu did not start immediately after purchase.

While the renovation of Marais was on going, Pfister located two (2) additional properties for the venture to acquire. In November 2007, 2736 Lavender St. ("Lavender") and 1501-03 France St. ("France") were also purchased. However, because Burghardt lacked sufficient funds to

---

[9] The Act of Sale and Settlement Statement were not introduced into evidence. However, Debtor's financial records reflect cash payments of $1,000.00 and $41,785.87 to purchase Marais. Exh. 19.

[10] Exh. 32.

purchase the properties, Pfister advanced the cash needed to buy them.[11] Nevertheless, both properties were placed in the names of Burghardt and Pfister as co-owners. As with Marais, Pfister immediately began renovations on both properties, supplying labor and materials. Renovations were complete in January 2008 on Lavender and April 2008 for France, but no sales were forthcoming. As a result, both properties were rented.[12]

In November 2007, both Pfister and Debtor were experiencing the financial strains of owning the Properties. As a result, they decided to mortgage Marais in an effort to assist them with cash flow. However since JEB was a newly formed entity without a significant credit history, Pfister and Burghardt agreed to transfer title in Marais to Burghardt for the purpose of securing the loan. The loan was obtained in the name of Burghardt, and the proceeds were deposited into the JEB account on November 19, 2007.[13]

Following this transaction, Pfister began submitting renovation costs to Burghardt for reimbursement. Burghardt used the proceeds of the Marais financing to fund the renovations on Lavender and France. In addition, she used the money to pay for repairs to Marais and satisfy the monthly mortgage payments. She also used the JEB account to satisfy renovation costs on Fountainbleu and advanced Pfister funds to satisfy renovation or acquisition costs on personal properties owned by him on Sage and Pauline streets ("Sage" and "Pauline").[14]

---

[11] France was purchased on November 12, 2007, with a cash payment of $26,000.49 including closing costs. Exh. 9. Lavender was also purchased on November 12, 2007 with a cash payment of $ 36,096.29 including closing costs. Exh. 16.

[12] France was rented in May 2008 and Lavender in March 2008.

[13] Exh.19.

[14] The Marais loan netted $100,183.70 for the partnership. Exh. 19, line 25.

5

In January of 2008, the parties elected to mortgage Lavender. However, because Pfister already held several mortgaged properties in his name separate and apart from, those co-owned with Debtor, he was considered a commercial enterprise. In an effort to obtain a better interest rate, he donated his share in Lavender to Debtor. Again, Burghardt obtained a loan from Chase in her name and placed the proceeds from the mortgage in JEB's account.[15] From January through April 2008 the loan proceeds funded costs associated with Marais, Lavender, and the renovation of France, Fountainbleu, Pauline and Sage.[16]

On April 16, 2008, France was mortgaged to Chase by Burghardt. Again, Pfister donated his interest to Burghardt who then obtained the loan and placed its proceeds into the account of JEB. As with the prior loans, the funds were utilized to satisfy expenses associated with Marais, France and Lavender, as well as, the renovation costs on Fountainbleu.[17]

From November 2007 through the date of trial, Debtor managed the finances of the relationship with Pfister. All costs, expenses, reimbursements, rents and loan proceeds were placed into an account held in the name of JEB. Although JEB was an entity owned and controlled by Burghardt, it is clear that its account was used to fund and account for the activities on the properties, as well as, those of Burghardt and Pfister individually. Further, despite the parties original agreement, the costs of renovation were also paid in part from the JEB account both through reimbursements to Pfister and directly.

---

[15] Lavender was mortgaged, and $106,000 was deposited into the JEB account. Exh.19, 67.

[16] *Id.* Pauline and Sage were properties wholly owned by Pfister and to which Burghardt has made no claim.

[17] *Id.* Line 14. The France loan netted $106,153.07 to the partnership.

As a further complication, during the fall of 2007 and throughout the relevant period, Pfister was purchasing and renovating properties for his own benefit. Properties located on Sage, France and Pauline were being renovated simultaneously with Marais, France and Lavender. In November 2007, Pfister began submitting bills for labor and building materials to Burghardt for payment. Those invoices were divided by Burghardt, with the assistance of Pfister or his work foreman, between the renovations occurring on Marais, Lavender, France, Pauline, Sage and Fountainbleu.

On March 1, 2008, a tenant was placed in Lavender. France was rented in May 2008. Burghardt collected rents off Marais, France and Lavender, deposited them in the JEB account, and paid maintenance repairs, mortgage payments and other costs associated with these properties from the same account. Advances to Pfister for his other properties ceased in April 2008. However, Burghardt continued to use the partnership funds to satisfy the renovation costs associated with Fountainbleu and performed by third parties.

The financial strain caused by Pfister's purchase and renovation of the properties, as well as, Burghardt's funding, debt assumption and management, caused their relationship to sour. By May 2008 the parties no longer communicated with each other and Debtor was left to manage on her own the four (4) properties in which Pfister claims an interest.

Attached as Exhibit A to this Memorandum Opinion is an accounting of the funds contributed, generated, and spent between Burghardt and Pfister for Marais, France and Lavender. Also included are funds advanced for the benefit of one or the other of the parties' personally.

## II. LAW AND ANALYSIS

### A. EXISTENCE OF PARTNERSHIP

La. C.C. art. 2801 defines a partnership as "a juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit." A partnership is created by a contract and is governed by the laws of contracts.[18] Each partner participates equally in profits, commercial benefits and losses of the partnership, unless the partners have agreed otherwise.[19] The same rule applies to the distribution of assets, but in the absence of contrary agreement, contributions to capital are restored to each partner according to the contribution made by each.[20]

Pfister and Burghardt never reduced their intentions to writing. The existence of a writing is not determinative of the existence of a partnership. A plaintiff can establish the existence of a partnership even in the absence of a writing as long as both parties intend to have a business relationship between them and that relationship has all the major characteristics of a partnership. *LaRocca v. Bailey*, 799 So.2d 1263 (La.App. 3rd Cir.2001); *Butler v. Sudderth*, 784 So.2d 125 (La.App.5th Cir.2001), writ denied, 799 So.2d 485 (La.2001); *Johnson v. Antoine,* 799 So.2d 485 (La.App. 5th Cir.1999).

---

[18] La. C.C. art. 2802.

[19] La. C.C. art. 2803.

[20] Official Comment (b) to La. C.C. art. 2803 provides that unless otherwise agreed, partners are entitled to the restoration of their contributions to capital even when the restoration might result in an unequal distribution or be disproportionate to the sharing of profits.

Generally, the existence of a partnership or joint venture may be inferred from the conduct of the parties. *Tedeton v. Tedeton*, ____ So.3d _____, 2012 WL 413838 (La. App. 2 Cir. 2012) (citing *Riddle v. Simmons*, 922 So.2d 1267 (La. App.2d Cir. 2006), writ denied, 929 So.2d 1259 (La. 2006). The existence of a partnership may be established by proving (1) the alleged partners mutually agreed to form a partnership and to participate in the profits that would accrue from the business in determined proportions; (2) they agreed to share in the losses as well as the profits of the partnership; and (3) the property or stock of the enterprise formed a community of goods in which each party had a proprietary interest. *Porter v. Porter*, 821 So.2d 663, 671 (La.App.2d Cir.2002); *Harris v. Wallette*, 538 So.2d 728 (La.App. 2d Cir.1989).

It is evident that Pfister and Burghardt intended to enter into an arrangement wherein one or both parties would purchase Katrina-damaged properties. Burghardt testified that the parties initially agreed that she would purchase the properties and that Pfister would renovate them. The renovated properties would then be sold. Both parties believed that the purchase and renovation costs would be roughly equivalent and that resulting profits would be split equally between them. Burghardt testified that the parties never discussed sharing losses.

In fact, Burghardt and Pfister purchased properties for cash, but the purchase prices were not always supplied by Burghardt. They also varied in how they placed title. Pfister undertook the repairs and initially fronted the costs of renovation for Marais. However, by the time France and Lavender were purchased, since Pfister funded the purchase price, the costs of renovation were submitted to Burghardt for payment. Although the renovation costs were paid by Burghardt, she did so with the proceeds of loans taken out on partnership properties and the rents they generated. Even the mortgage installments were satisfied from the Chase loan proceeds and partnership revenues.

9

Beyond the initial payment of the acquisition costs on Marais, Burghardt did not contribute substantial sums to the venture during 2007-2008.

Under the totality of the circumstances, the pattern of dealing between the parties, and their overall conduct, this Court finds that the parties intended to form a partnership to purchase houses in the area around the Ninth Ward. The properties on Marais, Lavender and France fit this goal and are projects undertaken by their partnership.

Throughout Burghardt and Pfister's relationship, Fountainbleu was treated differently from the other three (3) properties. First, it was purchased with a mortgage loan in Burghardt's name rather than by cash contribution funded by either Pfister or Burghardt. Second, renovations were not started immediately after sale. Third, it was located in a part of the city far from the Ninth Ward and of a very different caliber. Burghardt testified that Fountainbleu was purchased by her for her personal residence. She acquired the mortgage loan for its purchase and paid for all costs of renovation. Although Pfister initially offered to renovate the property for her, the quality of his work was so poor that she ordered him off the property and contracted the work herself.

While Pfister claims that Fountainbleu was included in the business venture between Burghardt and himself, the Court finds Burghardt's testimony credible. Pfister contributed nothing to the property's purchase price, paid nothing on its notes and received reimbursement for the materials and labor he expended for the renovations he completed. In short, Pfister invested nothing in the property, was paid for his materials and labor and contributed nothing to its purchase.

In addition to the above, the Court finds it persuasive that Pfister did not appear to believe he held an interest in Fountainbleu. In November 2007, Pfister composed a solicitation proposal for new investors ("Proposal"). He faxed the handwritten Proposal to Burghardt for typing. The

10

Proposal contains a list of the costs to purchase and renovate properties in which Pfister held an interest. The costs are then compared to his estimate of the renovated value for the properties in an apparent attempt to convince others to invest in his projects.[21] The list includes details on Lavender, France and Marais, along with other properties he individually owned on Lavender, Pauline, Mazat, Eden and South Jefferson Davis. Fountainbleu does not appear on this list despite the fact that it had been purchased in September 2007. Pfister's draft letter "To My Investors" also does not mention the Fountainbleu property.

A second draft investor proposal was faxed by Pfister to Debtor on November 15, 2007 ("Second Proposal"). The Second Proposal explains Pfister's experience in post-Katrina New Orleans in a narrative format. It mentions his partnership with Debtor and contains specific language about the France and Lavender houses. Again, Fountainbleu is not mentioned.[22]

This Court finds credible Debtor's testimony regarding her intention to live in the Fountainbleu home after slowly renovating. The facts adduced at trial establish that the parties acted in keeping with this understanding. Burghardt purchased Fountainbleu in her own name. The property was acquired with a loan and down payment supplied by Burghardt, not all cash. All expenses associated with the renovations were submitted to Burghardt for payment, but the majority of the repairs were performed by third parties, not Pfister or his crew. In fact, Pfister lodged no complaint when Burghardt ordered him off the Fountainbleu property because she was unsatisfied with the quality of his work. The totality of these facts led the Court to conclude that the parties did not enter into a partnership with regard to the purchase and renovation of Fountainbleu. Instead, it

---

[21] Exh. 27.

[22] Exh. 28.

was purchased by Burghardt individually for her residence.

### B. ACCOUNTING and TERMINATION OF THE PARTNERSHIP

La. Civil Code art. 2826 sets forth the steps to terminate a partnership.

> Unless continued as provided by law, a partnership is terminated by the unanimous consent of its partners; a judgment of termination; the granting of an order for relief to the partnership under Chapter 7 of the Bankruptcy Code; the reduction of its membership to one person; the expiration of its term; or the attainment of, or the impossibility of attainment of the object of the partnership.

Pfister has asked to terminate the partnership and sued for a judgment of termination. To the extent a partnership exists, Burghardt has not opposed termination. At termination, creditors of the partnership are paid prior to distributions to the partners. The largest debt of this partnership is the amount owed to Chase as mortgagee on Marais, France and Lavender.

In addition , Burghardt also submitted a list of accounts payable she incurred in connection with the partnership properties that remain unpaid.[23] The debts are principally owed to Burghardt Insurance for insurance on the properties and a few repairs. Because only Burghardt incurred this debt, the Court will treat the total of $21,100.21 as an additional capital contribution by her. The Court will provide for the Chase debt in connection with the division of the assets.

Pfister submitted into evidence various check stubs; American Express, Lowe's, and Chase Bank account statements; invoices; and labor summary sheets in an effort to prove sums he paid on behalf of the partnership or Burghardt individually. The Court finds the American Express and Chase statements lack credibility for this purpose. The American Express statements identify vendor payments by name and date, but they lack any identification as to purpose. The evidence

---

[23] Exh. 26.

established the Pfister liberally used his credit cards for personal expenses, as well as, business expenses. Pfister was also working on multiple houses during the relevant period only three (3) of which were owned by the partnership.[24] Even when identifiable as construction charges, the totals are lumped between multiple properties.

The Chase statements generally lack any identification of payee, but in the few instances when a payee is noted, the payment does not identify the property associated with the transfer.[25] As a result, it is impossible to determine either the nature of the payment or the job. As for the Lowe's statements, some of the charges have identifying job allocations, which are accepted as credible. However, the remaining charges lack any job identification, and the Court is unable to attribute them to a partnership project.

Regarding the invoices and check stubs submitted, the Court accepts the invoices if they are marked with an identifying job. The check stubs are often allocated, but in the case of labor, the breakdown of work by job is missing. Even so, the Court will accept the pay stubs as evidence of labor expended on behalf of the partnership.

Next, all charges were compared to the JEB accounting to determine if they were reimbursed

---

[24] The record reflects that Pfister owned a property on FranceSt. (different from the one owned by the partnership) and Jefferson Davis Parkway. At a minimum, work of the France property was proceeding in tandem with Marais. Thereafter, Pfister purchased properties for his own account on Sage and Pauline. He also owned several other properties.

[25] The Chase statements do not identify payees on checks, however in the case of wire transfers, the transferee is named. Specifically, Pfister's bank statements reflect American Express payments of: 1) $9,914.72 on August 17, 2007; 2) $9,263.97 on August 28, 2007; 3) $1,500.00 and $293.43 on September 4, 2007; 4) $3,000.00 on September 10, 2007; 5) $13,610.28 on October 1, 2007; 6) $6,072.52 and $2,377.43 on October 9, 2007; 7) $3,021.83 on November 14, 2007; 8) $743.49 on November 16, 2007; and 9) two(2) payments $10,000.00 on November 20, 2007.

through JEB. Payments to Pfister in reimbursement were taken from JEB's records. They included payments on Pfister's American Express account, as well as, direct payments to suppliers and subcontractors. The testimony reflected that Pfister or his foreman would allocate the charges between properties but also that they took payments on American Express *in lieu* of another reimbursable expense, i.e. labor. Many of the charges claimed by Pfister were also paid with his personal American Express. Payments were matched by dates of service and reimbursement, the period of time for which payment was requested and notations on checks and invoices.

Beginning with the charges claimed for the renovation of France, Pfister supplied credible evidence of $17,597.00 in supplies or subcontractor services and labor of $17,977.00.[26] However through payments by JEB, Pfister received $27,771.29 in reimbursements,[27] leaving a balance due to Pfister of $7,802.71 for France.

A review of Pfister's evidence alleging unreimbursed charges associated with Lavender's renovation yielded a credible claim of $11,566.88 for materials and subcontractor charges and $19,200.00 in labor expenses.[28] JEB's records reflect reimbursements of $9,160.00 for labor and

---

[26] The charges include an inspection by the City of New Orleans ($562.50); invoices by Kellet Lumber ($3524.38); Barnett ($565.35); drywall (39.66); Ronnie's Plumbing ($300.00); Lowe's ($744.86); Moreno Electrical ($1174); Sherwin Williams Paint ($777.11); countertops ($800.00); Dard Electrical ($9,000.00); ICI Paints ($109.14) and unreimbursed labor of $17,977.00 for the period of 2/22 through 4/3/08.

[27] Payments to American Express attributed to France ($18,244.45); misc. receipts to Pfister's foreman as reimbursement for payments ($2,100.00); City Inspection reimbursement ($1,100.00); Kellet Lumber reimbursement ($3,326.84); and reimbursement for Dard Electrical ($3,000.00).

[28] Sherwin Williams ($1,021.83); Barnett ($554.12); Surplus Roofing ($1,112.50); Kellet Lumber ($1,821.39); Lowe's ($57.04);Dard Electric ($7,000.00); labor ($19,200.00: 11/2-11/4, 1/7-1/12).

$15,626.01[29] in other charges leaving a net claim due to Pfister of $5,980.87.

Very few receipts were supplied for Marais. From the credible evidence admitted, the Court finds that $12,657.41 in costs and labor incurred by Pfister is associated with Marais' renovation.[30] None of this has been reimbursed.

Pfister's evidence of amounts advanced for his work on Fountainbleu constitutes another claim. However, in this case, it is a claim against Burghardt personally not the partnership. A review of the credible evidence warrants a claim for $7,331.95 in materials.[31] JEB's records reflect reimbursements to Pfister in the amount of $10,240.55,[32] an amount in excess of the evidence submitted. Therefore, Burghardt does not owe Pfister any additional funds on his claim for work performed on Fountainbleu.

Finally, the parties acknowledge that $14,000.00 in cash from Pfister was utilized by the partnership in January 2008 to pay for labor and other partnership expenses.[33] This contribution has been added to Pfister's capital account. An additional $2500.00 in expenses incurred in 2012 and stipulated to at trial has also been added to Burghardt's capital account.

The Court is sympathetic to Pfister's assertion that he purchased supplies such as sheetrock

---

[29] Dard Electric ($3,000.00); American Express payments attributed to Lavender ($8,203.42); Sherwin Williams ($1,400.00); A/C repair ($1,200.00); Kellet Lumber ($1,822.59).

[30] Johnstone Supply ($128.44); Sherwin Williams ($252.53); Standard Glass ($150.65); Dard Electric ($200.00); labor ($3241.00); Lowe's ($1,700.00); Dard Electric ($5,075.00); Williams & Williams ($709.79); A/C repair ($1200.00).

[31] Peters Electrical ($4,000.00); Barnett ($1,774.22); Sherwin Williams ($282.23); Kellet Lumber ($790.73); roof repairs ($185.42); Home Depot ($86.44); and Lowes ($212.91).

[32] American Express ($2915.62); Cash misc receipts ($1257.00); Kellet Lumber ($2067.23); Cash electrical ($4,000.00)

[33] Exh. 52.

and nails in bulk and used them to renovate the partnership properties. Nevertheless, it is unable to manufacture a number for Pfister's expenses and resulting capital contribution.

Based on the accounting prepared by the Court, Pfister contributed $106,588.21 to the partnership in the form of cash and paid expenses. However, he withdrew $119,716.50 in the form of payments for the purchase or renovation of Sage, Pauline or cash payments of $38,600.12 from the JEB account leaving him with a net contribution balance of ($13,128.29). Pfister also holds a claim against Burghardt for one half the value of the properties he donated to her.

Burghardt contributed $115,456.28 to the partnership. She too withdrew amounts from the partnership in the form of payments for renovation costs associated with Fountainbleu, mortgage or other costs on that property and cash withdrawals for her personal benefit. The total amount advanced to Burghardt by the partnership for costs associated with Fountainbleu was $130,444.00. Cash withdrawals or expenses paid for Burghardt with partnership funds equal $5,228.84. The net balance in her partnership account at the end of 2011 was ($20,216.56).

In addition, Burghardt owes Chase $338,186.66 based on the proofs of claim filed for the properties located at Marais and France and Debtor's scheduled debt for Lavender.[34] Since the proceeds of these loans were used for the benefit of the partnership, Burghardt has a claim against the partnership for their satisfaction.

Usually, upon termination, the Court would sell the properties, settle the debts of the partnership, divide any remaining cash and bring each partner's capital balance to zero ( 0 ). Because Burghardt filed for bankruptcy relief, the partnership properties are now part of the bankruptcy

---

[34] POC 1, 2. As of the date of this Opinion, Chase had not filed a proof of claim for Lavender. P-36.

estate since they were titled in her name at the time of filing. Although Pfister's share was donated in an effort to finance the properties, at this juncture, they are not subject to return.[35] Offsetting any loss to Pfister is the obligation by Burghardt to satisfy the Chase loans the benefits of which were enjoyed by Pfister. As a result, the Court will calculate the rights between the parties based on the value of the partnership as of December 2011.

The partnership generated $461,533.57 in rents, loan proceeds and insurance funds from 2007-20011. From this sum, costs of renovation, maintenance, mortgage payments and other expenses for Marais, France and Lavender total $368,920.25 for the same period. Therefore, the net cash balance from 2007-2011 is $92,613.32. The Chase loans total $338,186.66 leaving a net value of ($245,573.34) which is offset by the value of the properties, $280,000.00. The value of the partnership is therefore $34,426.66.

Thus, Burghardt and Pfister would each be entitled to $17,213.33 in value on liquidation of the partnership's assets. However, Pfister has already received $13,128.29 leaving a balance due to him of $4,085.04. Burghardt's account reflects her receipt of $20,216.56 reducing her share to ($3,003.23). The difference between these two (2) accounts, $7,088.27, is the equalizing payment on termination.

## III. CONCLUSION

Based on the above accounting and findings, the partnership between Debtor and Pfister is terminated. Debtor retains ownership in Marais, France and Lavender with responsibility for satisfaction of the corresponding mortgage loans and any outstanding claims she incurred on behalf

---

[35] 11 U.S.C.§544 prohibits the avoidance of a transfer if a bona fide purchaser could defeat the claim.

of the partnership. Pfister is released from any responsibility for those debts whether in indemnity or contribution. The equalizing payment between Pfister and Burghardt as a result of the termination of the partnership is an unsecured claim in favor of Pfister and against Burghardt for $8,343.53 which is subject to the terms of her Plan. Pfister is also responsible for the satisfaction of any claim or debt incurred by him on behalf of the partnership. Burghardt is released from any responsibility over and above the sum of $8,343.53 for those debts whether in indemnity or contribution. The property located at Fountainbleu remains the individual property of Burghardt.

New Orleans, La., April 6, 2012.

Judge Elizabeth W. Magner